Good afternoon, Your Honors. Deputy Attorney General Eric Christofferson, on behalf of the appellant, the warden in this case, I would ask to reserve five minutes for rebuttal. You may do so, Counsel. Just watch the clock. Thank you, Counsel. Thank you, Your Honor. In granting the writ, the District Court below failed to properly consider the substantial change in the allegations and facts supporting Petitioner's claim of ineffective assistance of counsel in the penalty phase that occurred after this Court had remanded the case in 2004. These factual changes in the allegations compel a comprehensive reexamination of the allegation that the District Court failed to meaningfully undertake. On remand, specifically, it was discovered that trial counsel, Hugh Goodwin, contrary to Petitioner's earlier allegations before this Court, had obtained and reviewed the record of the previous trial and had also obtained the files from prior counsel in the original case that he was retrying. That file contained voluminous records detailing Petitioner's difficult childhood obtained by prior counsel, and it is now established that Goodwin had... Counsel, is there any evidence that Mr. Goodwin actually read anything that he got? There is no indication in the record that he obtained that he, other than he did prepare, I believe, a chronology of the, as Petitioner noted in his brief, and he did obtain it and Petitioner has conceded or indicated that he read and obtained and reviewed that entire record. He certainly used many of those records in the course of... What would indicate that he did review them? What evidence is there for that? Well, the evidence that there is that he reviewed them was his use of some of those records when he was presenting the testimony of Joe Walden, who was the probation officer. He introduced a number of those records at that time and had Joe Walden read and refresh his recollection about information in those records. Furthermore, Your Honor, under Strickland v. Washington, the presumption in the absence of evidence to the contrary is that counsel acts competently under the circumstances. It's uncontested that he obtained those records, and so the reasonable presumption of competence would dictate in the absence of evidence to the contrary... He made a chart, you say, of the family, didn't he? The family members? Yes, Your Honor. That's the one record that's in addition to what he may have had. What did he do with those? What did he do with those records? The chart. With the chart? He didn't use it in the course of his... There's no evidence of his doing anything with it. Correct, Your Honor, he didn't. You know, we found in the first, or said in the first go-around on this case, based on his declaration, that the reason he didn't pursue any of the mitigating evidence through the family was that Stankiewicz had said he didn't want the family members contacted. Correct. That's all he said. That's all he said. That was his 1989 declaration. Right. And there was no evidentiary hearing, as I understand, on this remand. It was all done by documents and stipulation? It was ultimately that the district court didn't really make any findings with regard to what evidence would have been developed in, had counsel acted. What was the reason for there not actually being an evidentiary hearing? Mr. Goodwin, do we know what his status is for... Mr. Goodwin has passed away. He's dead. And he was dead at the time of this, on the 24th. That's what I couldn't remember for sure. Okay. So his availability to expand the record and discuss his reasoning and beyond the one information in the 1989 declaration. So you said, I think, things, or if you didn't say it here, you said it elsewhere, that things are dramatically, the facts, the record is dramatically different from what it was the last time. I'm having a little trouble understanding what the drama is in this. I'm not being facetious. You're saying that, well, he had access to it, and therefore we have to engage in the presumption that he read these documents and had all of this voluminous history, which applying the Supreme Court law about duty to investigate during a penalty phase, we didn't affirmatively investigate. He didn't go outside whatever he may have read in the records, and there's no evidence that he actually did to operate off a presumption. What we do know is what he did do, and having reviewed that previously, we concluded that that didn't constitute effective assistance of counsel and was prejudicial. So I'm helpful to note if you could explain what's dramatically changed that should cause us to change our views. Well, one of the reasons that this Court found it on the issue of both deficiency and prejudice was that, and the Supreme Court has indicated in a number of cases, that the decision to further investigate is based on the circumstances that are in front of trial counsel. In that case, the Supreme Court has determined that he had access to records of essentially petitioner's background, from his Napa State Hospital to his probation reports and numerous psychiatric reports throughout his childhood. Now, how and when do we know this? How and when did we... Do we know this information that you're referring to? We have determined that he has, and that he obtained those materials at some point prior to the trial. Yeah, but when was that determination made? That determination was made post-remand. Post-remand? Prior to this, yes. When the case was before this Court in 2003, I believe is when the argument was, the allegations at that point, there was a second declaration signed by Mr. Goodwin, at least part of it has been repudiated by petitioner, that indicated that Goodwin didn't obtain any records, didn't have any background information, and essentially the state of the allegations in front of this Court is that Goodwin did virtually nothing at all. Okay, but I'm trying to pursue your point. You say that we now know that he had all this material. Yes. Was that in front of Judge Ishii? Yes. And what did he do with it? Judge Ishii, when he evaluated that, he recognized that, and he concluded that this Court had already determined that, although... Well, you're saying he felt bound by something in our prior opinion? It certainly read that way, Your Honor, in terms of when he, evaluating the issue of deficiency, Judge Ishii concluded that this Court's determination that his failure to investigate beyond the records in the trial file, which was not even a factual matter in front of this Court, was deficient. And this Court didn't make that determination because that was not the state of the allegations when this case was before this Court. Now, as has been mentioned, there was no actual evidentiary hearing on remand. There were a lot of paper exchanges, obviously. Correct. Is Judge Ishii's order defective for failure to have an evidentiary hearing, per se? Certainly, Judge Ishii, it is to grant the writ under these circumstances, given... Did you consent to the non-evidentiary hearing? No, Your Honor. What would have... Given that Mr. Goodwin's dead, what would an evidentiary hearing... What would you have argued at an evidentiary hearing? Well, we would have certainly explored many of the specific allegations, and an important aspect of the evaluation of prejudice in this case is the extent that this information actually would have been available to Goodwin at the time. That is something that would have been appropriate to explore. And how would you have explored that at a hearing that you didn't have an opportunity to do otherwise? Well, one individual that we've never heard from, other than through untested statements and interviews, is the petitioner himself. He is the one who has communicated... He's the last one who is around who remembers his communications or has access to what he told Goodwin about his conduct and about Goodwin's tactics, and certainly would be a potential source of information about the development of the penalty phase defense in this case, as well as exploring the questions... You, of course, have elsewhere in your briefing called into question anything Mr. Stankiewicz touched. So any statements that Mr. Stankiewicz made about his childhood or what Goodwin did or didn't do, you have called into question. So is there anything that the district court relied on that turns on something that Mr. Stankiewicz said in a written declaration? Well, that's the problem with the district court's orders. The district court didn't articulate any particular evidence that was the basis of its ruling. Essentially, the district court said, there's evidence about petitioner's background... Well, there's quite a bit of evidence, of paper evidence, in the record about Mr. Stankiewicz's childhood, about his other criminal activities, and about his family history and his drug use. And none of that would seem to turn on either Mr. Goodwin or Mr. Stankiewicz. A lot of these are state records. Yes, exactly. Yes, they are. From the 1960s, 1970s. Exactly, Your Honor. And in exploration of those records, again, there's a question of how Goodwin could have reasonably been able to get those records in front of the jury in 1983 in this case. That is an important aspect of prejudice. Because ultimately, we do remember that the petitioner in this case had instructed or opposed the use of his family members as witnesses in this case, as well as the use of expert testimony. Much of the evidence would have required the evaluation of an expert testimony, as opposed to just coming in as hearsay documents or potentially... Well, how did he get in? He got it in, you just told us, he got it in through Walden. He got some in through Walden. Well, he got it in through Walden, and he put his sister-in-law on. And you're saying, we did talk about this in our opinion. Well, yes. That's the argument you made before, and it's somewhat inconsistent with the record. Whatever Goodwin may have been, maybe Stankiewicz raised an objection or a statement at some point, but when it came down to it, and now you're relying on it, he put on, through hearsay, Walden's testimony. He goes back to, what, age six, and then he's apparently, I don't know what's his foundation for testifying to the contents of the files that you say now were taken out of this treasure trove, and that he put on the sister-in-law, so there he had somebody, she was a family member. And the whole point of the remand was, look, there was all of the stuff that you're arguing now, under Wiggins and Williams, when we look at what Goodwin could have put on to amplify on that, instead of going off on this other toot that he, and I don't mean to belittle it, because the man's not around to defend himself, but we've already been through this argument, and I keep coming back to your statement at the outset that things are dramatically different, and I'm having a little trouble seeing what's dramatically different. Well, one of the dramatic differences is that when this case was before the court before, was that the state of the allegations were that Mr. Goodwin didn't have any of those records. He couldn't have used them, because he didn't even bother to get them in the first place. That was the allegation. So he not only didn't make a choice, he didn't then his decisions to choose to present them become evaluated under an issue of reasonableness. But counsel, I'm still having trouble. Mr. Goodwin wasn't silent on this. There was a declaration from him saying, why didn't he put any information on? And he said his declaration was to the effect, just as you've repeated today, that Stankiewicz told him he didn't want any family members involved. That's all he said. And then you're saying, well, if he had done something, there would have been problems of getting them in through hearsay and the like. That's not what Goodwin said. His tactical decision was according, and that's all he said in the declaration, was that Stankiewicz told him not to contact family members, and he didn't want any experts used. And that's it. And we've already dealt with that, saying that given the records that were turned up later, and I don't know what difference it makes that if Goodwin had them in his possession and chose not to pursue it, in light of all of that evidence that does reflect a terrible childhood and abuse and the like, which the district court said, it's still found in the records a lot of evidence to support our earlier conclusion that there was a magnitude difference in terms of what was presented at this penalty phase. And that's the basis on which the district court granted the writ. But what the district court didn't grant the writ on was there is additional evidence from the official records regarding Mr. Stankiewicz, but the district court really didn't evaluate and re-weigh that given what was presented. Are you arguing clearly erroneous or an error in law in failing to address certain issues? I would ultimately, Your Honor, it's clearly an error of law because the district court really didn't make any specific findings with regard to what additional evidence was should have been presented. Because there are the most shocking allegations of abuse that were in front of and alleged have, again, now been minimized and repudiated. For one instance, the issue of sexual abuse in Napa State Hospital when Petitioner was eight, that was something that this court addressed and cited and discussed a number of times in its original opinion. That was ultimately found to be based on an untested inference by the, I would say, foster sister of Petitioner. I'm trying to get a handle on fact-finding here. You say ultimately not established. That's when? In state court? In the remand to Judge Ishii? Where? In the remand to Judge Ishii. When Judge Ishii issued the order to grant the writ, Judge Ishii did not make any factual findings about what evidence in the record was really available and should have been presented. Because the issues of abuse and many of the allegations of drug use and whatnot have never been adequately explored in the context of an evidentiary hearing. Did he simply ignore them, according to you, or did he rule that they were not important or not persuasive? What do we have here? Well, the declarations from the Bollmeier family, both Rosamond and Rosetta Bollmeier, who is the foster family that he originally stayed with, the district court found that they had significant problems with credibility. And Petitioner in his brief has, in footnote 25 of his brief before this court, has indicated that he's no longer relying on anything in the Bollmeier declarations or statements, which include some of the most shocking and argument claims that Petitioner was acting like an animal when he originally came back from Napa State Hospital. And the district court did question the credibility of those findings and so didn't rely on those, but then ultimately said that, essentially concluded that, well, there's a number of records of Petitioner's childhood that are essentially uncontested from his police reports from Napa, or from probation reports in Napa State Hospital. And then said, because some of those are likely true, the writ should be granted. Using this court's language in the context of a colorable claim, that some fraction of additional evidence could have made a difference. And what should he have done, according to you? He should have identified what fraction, what that evidence was, so we could properly analyze it, because much of the evidence that is of Petitioner's records is either essentially further cumulative of what the jury was aware of, that Petitioner had a horrible childhood. He was taken away from his parents. He wasn't returned to his parents for years. The only implication of that before this jury, before the jury, could have been that he had a really bad family and his parents were, he knew that they had criminal backgrounds. This came out in the context of the trial. So what are you asking for? A remand for another, I mean, for a full-bore evidentiary hearing? Or what is your request for relief here? Well, our request for relief is potentially two-fold. One is that given the new set of facts about what Goodwin was able, what Goodwin had in front of him, and the evaluation of credibility. You say facts. Are you talking about facts or evidence? Facts. Well, were there findings? No, I'm sorry. I would say the evidence of what Goodwin now we know had in front of him, had available to him and then chose not to present, either partially because of following his client's views and maybe also recognizing that much of that evidence was a double-edged sword because much of it had information of his petitioner's diagnoses of antisocial personality disorder. All right. So you want a remand for an evidentiary hearing on those issues? Yes. And you said there was something else? Well, the first argument would be that there's no, given the change in factual circumstances, that there's no longer a culpable claim supporting ineffective assistance of counsel in the penalty But barring that, our fallback position would be that this case must be remanded for appropriate factual finding and development of the specific record that would have been available to Goodwin. All right. On a different issue, the test on prejudice. Belmontis came down, as I calculate, just before Judge Ishii's decision. Have you made an argument as to whether Judge Ishii applied the correct prejudice standard? We certainly argued Belmontis in the course of our briefing in front of this court. I'm talking about Supreme Court Belmontis because it's been back and forth several times. Yes, I understand. Supreme Court Belmontis, where the Supreme Court recognized that, especially in the context of prejudice analysis, that it must consider or evaluate the potential negative or opening the door to aggravating evidence, which has been something that we've considered. In other words, that the evidence could cut both ways. In other words, even though you enter it for mitigating purposes, a jury would be free to find that contrary to being mitigation, it establishes aggravation. Correct, Your Honor. All right. Now, did Judge Ishii apply that standard or not? I don't believe that Judge Ishii did. He may have, and I confess ignorance on, because we did move for reconsideration, and I cannot recall if we had specifically cited Belmontis at that instance. But in any event, you're making that argument, I take it. Yes, and we did make it in our brief. And that is, again, an important necessary aspect of evaluating this evidence. Assuming that those reports can come in, the totality of the report comes in and opens the door to the prosecutor being able to point out evidence of, in fact, he's been diagnosed with antisocial personality disorder. And another aspect that is involved, yes. I tripped on that when you first mentioned it. This is in the penalty phase. What was the problem with his being diagnosed with that disorder at the penalty phase? Well, this court has repeatedly recognized in a number of cases, Beardsley, I believe, is one of them, that a diagnosis of antisocial personality disorder can be considered an aggravating circumstance, something that the jury can put on the scale of aggravation rather than mitigation. And so that level essentially is described, and many of the diagnoses in this case found that they used the term sociopath, which as opposed to, and another aspect of this is throughout his history, these records also demonstrate that he has no, that he was tested multiple times as a youth and there's no organic brain damage. There was no thought disorders. He was essentially diagnosed with being antisocial and having emotional, being a severely emotionally disturbed young man, which is certainly understandable given his background. It's certainly understandable and something that the jury in this case, knowing what they did from Joe Walden, could have reasonably inferred that of course Petitioner was somebody who lived a troubled life. Counsel, you're down to five minutes. You indicated you want to reserve. Thank you, Your Honor. I will. May I do so? Good afternoon, Your Honors. Harry Simon for Petitioner. Mr. Simon? Thank you, Your Honor. In this case, there are sufficient uncontested facts to sustain the judgment. The warden has admitted in his briefing that he doesn't contest the official records that predate the murder in the case, both in appellant's reply brief and in appellant's opening brief. He's noted that official records that give contemporaneous accounts of events are inherently trustworthy, and in fact the district court, at the request of both parties, expanded the record significantly, the thousands of pages of documents, before reaching the conclusion that in fact Goodwin rendered deficient performance and that Mr. Stankiewicz was prejudiced by that fact. And I think looking at the record fairly as a whole, it is clear that the district court had sufficient facts to render both of those conclusions. Appellant has recognized that Mr. Goodwin did no independent investigation of the case. He hired no experts. The Troy Jones transcript talks about the fact that at the time, he really had no paralegal, he had no secretary. He was really a one-man band, and he was in this case as well. And his sole justification, as counsel has acknowledged, was that Mr. Stankiewicz wouldn't agree to any mitigation. And it wasn't just that he didn't just say that he didn't want family members or didn't want experts. He said he didn't want mitigation at all. Yet, in fact, the record is belied by that fact. And the district court found that in its order on reconsideration, that when Mr. Stankiewicz, as this court did, when Mr. Stankiewicz wanted to make an objection known, he made it known. And he didn't interfere, in fact, with the presentation of evidence. And there was evidence from family members, from Theresa Montgomery, as well as evidence from Joe Walden regarding the petitioner's background. As this court held in Hamilton, when counsel disregarded any alleged instructions to the contrary and presented a mitigation defense, albeit an insufficient one, we need not analyze the facts of petitioner's alleged refusal to cooperate. And that does seem to be the case here. Doesn't one have to take it into account if he was putting this in as relatively light as it was against a background of having been told that the petitioner didn't want this? Don't we have to take that into account? It's not an all or nothing, is it? Well, the question is whether, in fact, Goodwin's declaration that he's doing this simply because Mr. Stankiewicz doesn't want mitigation, doesn't want any mitigation, can be believed, or whether, in fact, it is belied by the record. And I think, in this case, it really is belied by the record. Well, couldn't it be possible that Stankiewicz did not want this to happen, but this attorney decided, notwithstanding that, that he had to make some effort? Well, what Mr. Goodwin said in his 1989 declaration is that he talked to Mr. Stankiewicz. He didn't talk to Mr. Stankiewicz about this until, in fact, the guilt phase was done. And at that point, it's really late, really almost too late, to start developing a case. So there is a level at which the record suggests that Mr. Goodwin is, to some degree, sort of flying by the seat of his pants here. And this court, I think, correctly found that, in its order on remand, that the case that Mr. Goodwin presented was minimal, it was really inadequate. It was sort of impressionistic. Now, does that tantamount to a finding of fact that Judge Ishii was required to recognize? Judge Ishii needed, I think, to independently review the record, and did. And Judge Ishii did make findings on prejudice. They weren't, perhaps, as full as we might have liked, but they did note that even accepting the warden's objections to some of Mr. Stankiewicz's allegations, evidence shows that Stankiewicz was already severely emotionally disturbed by the time he was age six. Well, one of the things that bothers me about that part of the case is the increased advice we've been receiving from the Supreme Court of the United States, particularly in the last Belmontes Supreme Court decision, in which the standard, if I understand it correctly, has to be that Judge Ishii has to take into account not just the mitigating evidence, but also the potential that that evidence could incline a jury to find aggravation. In other words, you don't focus on the mitigation, you focus on the total picture. Am I summarizing it more or less accurately? I think that's correct, and I think it's worth looking at it that way and thinking about the aggravating evidence that had already been presented regarding Mr. Stankiewicz, the number of assaults that the jury was already aware that he had engaged in, and the crime facts themselves. The question that was really facing Goodwin at the time was, am I going to really explain this and try to let the jury know that there are reasons behind this, or am I going to put on Joe Walden to say, well, there were two incidents of abuse, but really there's no pattern of abuse that I know of otherwise, and when I visited Mr. Stankiewicz's home, it was orderly. And I'm going to leave out other facts, too, that don't necessarily even bring in antisocial personality disorder that would have been really helpful to know, like the fact that from the records themselves, it's clear that his parents are chronic alcoholics, that there's an extraordinary level of violence within that family home. And those are the kind of facts that I think would have been worth letting the jury know, letting them know that all ten of Mr. Stankiewicz's siblings had to be removed from the home because the conditions there were so bad that the children couldn't sit down to eat because there were so many cockroaches there. These are the kind that all of Stankiewicz's ten siblings ended up with this sort of horrible history of delinquency, dependency, delinquency off an adult prison. This was someone who really... But does all of that evidence point in a single direction? I think that evidence points in a single direction, which is that the client really didn't have anyone to rely on, that he was really on his own, that he couldn't be returned in the family home because conditions were so bad, that when he left the Bowlemeyers, there were attempts to reunify, but it was never going to happen for him. And I think that all points in a single direction. Could a jury nevertheless consider that something aggravating to the extent that this just proves that this person has a psychopathic personality and is inclined to abusive behavior? Well, I think the evidence about his family certainly doesn't impact negatively on him. I mean, this is even separate and apart from the evidence regarding his own emotional disturbances, which are really severe. I mean, you've got a six-year-old child repeatedly chewing through restraints. Someone who has to be administered inframuscular injections at an adult state hospital because medicine doesn't work fast enough for them. Someone who's chewing... Counsel, if you introduced all of this evidence, might a jury simply conclude that he was beyond rehabilitation? Well... Is there a danger of that? I think there's a danger... Would you put all that evidence on today? I would put all that evidence on today. I think there's a danger if you don't put that on, that they're going to look at this long list of aggravating circumstances as Sanquin himself after he was first sentenced to death and reach the same conclusion. So the question is whether you're going to try to explain it in some way that elicits sympathy or not. And I think you do need to go into some level of detail if you're going to be successful in doing that. Can you address two questions which are related? One is why there wasn't an evidentiary hearing by stipulation? It was without prejudice, as I understand it, to an evidentiary hearing. But what gave rise to that? And in relation to that, apparently these documents that Goodwin had were not known the first time we considered this case. What was the focus of that before Judge Ishii? And what do you draw from the fact that Goodwin did have access to the files? All right. The reason that it was decided the way it was, when this case went back, there was a discovery that was conducted, trial counsel files, and there was a motion to expand the record, which we agreed to do. In addition, the court issued an order to show cause to the attorney general's office as to why relief should not be granted based upon the record. We were appointed later on after that discovery had taken place. And in looking over the records ourselves, it did become clear to us that Mr. Goodwin had first trial counsel's files, and we admitted as much. The only thing that we could really gather in terms of his review, and this is the only concession that we made, was that there was a one-page chart showing his location at various times. But that did appear from the record. The court asked us to brief the issue of the merits, both sides, to brief the issues of the merits. We took the position that there was sufficient evidence, based upon the expansion of the record, to grant relief. But if there was not, that certainly we still had a colorable claim requiring an evidentiary hearing. The respondent took the position that, in fact, relief should be denied. They didn't request an evidentiary hearing. And that sort of procedural posture from which we got the court issuing, after the briefs on remand came in and a reply brief came in, the court then determined that there were sufficient uncontested facts to grant relief. So you're saying that it was your side that wanted the evidentiary hearing but acceded to this without prejudice, but the state did not itself ask for an evidentiary hearing? The state did not ask for an evidentiary hearing. And so, Judge Ishii, these files, can you describe them? Are they voluminous? They are voluminous. They include all of trial counsel's files. In addition, we requested that the record be expanded to include all the documents that our experts had relied on informing their opinions. There had been a previous joint submission, and we wanted to include that as well as documents that were relied upon by our social historians. So if, since you had wanted the evidentiary hearing, what would be the scope or the focus of an evidentiary hearing? It's a similar question as to what we asked counsel for the state, which is what is going to be the nature of the evidentiary hearing? Where are we to go that route? We took the position that the court, in fact, as I say, that there were sufficient records for the court to grant relief for some of the same reasons that Your Honor has indicated. We really didn't think there were sufficient contested facts requiring an evidentiary hearing, as in James v. Friero. There were sufficient uncontested facts that it could be resolved on deficiency and performance. Our feeling was that there were some contested facts, however, regarding, for instance, brain damage, that couldn't be resolved one way or the other without an evidentiary hearing. If the court determined that the uncontested facts weren't enough, there should be an evidentiary hearing on those that were still contested. So brain damage would be the one area? Brain damage would be one. Rosetta Bullmeier's testimony, I know the social historian expressed some doubts about it. The court expressed some doubts about it. But I certainly want to interview Ms. Bullmeier and form my own opinions about her, possibly prejudiced. But, you know, with regard to deficiency, Mr. Goodwin isn't around anymore. The record is what it is with regard to that. You said that the district court made findings. What findings do you? The district court's findings were primarily on prejudice. At page 12 to 13, the district court stated, even accepting the warden's objections to some of Stankiewicz's allegations, the evidence shows Stankiewicz was already severely emotionally disturbed by the time he was age six. And then at 14 to 15, there's a quotation of Rosetta. Excuse me. Is this in the first? There were two orders. This is the first. This is the first order. One ER4. And that would be at 12 through 13. The court also in that same section, and this is at page 15, beginning at five, he said, by age 18, he was hardened by the years of criminal associations and surroundings. He had a deprived background, being institutionalized early in his life, and essentially raised in institutions. From an early life developmental standpoint, Stankiewicz has suffered from early childhood losses, prolonged separation from parents, poor institutional surrogate care. This has resulted in poor scholastic achievement as manifested by frequent runaways, behavior problems, scholastic underachievement, and finally culminating in antisocial behavior, which has occurred both in and out of institutional placements. And then on page 16. He's apparently reciting from Rosetta. He is. This is the analysis section, and he's really endorsing those findings. And this information was not presented.  The citations are to Walden, I noticed. The citation is to a probation report by Dean Thompson. Yeah, I was just saying, but earlier I noted that one of these quotes of findings is a probation report by Walden, and counsel for the state indicated that Walden presented some of this, or I don't know whether he presented his own conclusions or what. Walden. But what Walden put in was not as comprehensive as what Judge Ishii is summarizing here. No. No, it is not. No, it is not at all. And really the only other findings, I think, really come in the December 10, 2009 order denying motion for reconsideration, where the court distinguishes Landrigan and notes that Stankiewicz made appropriate. This is on page 5, AER 5. Stankiewicz made appropriate and understandable objections to various events during the trial, indicating he could and did make his objections known. But despite his alleged objection to the presentation and mitigating evidence, Stankiewicz did not interrupt or try to sabotage trial counsel's presentation. Those really are the factual findings. Counsel, where does Belmontes fit in? Of course, I'm referring to the last Supreme Court decision in Belmontes. Where does that fit in in terms of its applicability to this case? It wasn't expressly referred to, as I gather. But what's your take on it? I think Belmontes is quite distinguishable. In Belmontes, there was an effort to keep out a murder, an actual murder that had taken place. You really needed to structure the presentation of evidence very carefully in order to do that. It made perfect sense to do that. Here, you have so much evidence of antisocial conduct anyway. The jury is so likely to be inclined to view him in a negative light anyway. Admittedly, there are conclusions that he has antisocial personality disorder or is sociopathic. The fact of the matter is they're already likely to reach that conclusion. It's not really all that double-edged in the context of this case. Well, now, I guess what I'm really looking for is where in Judge Ishii's two decisions could we find that he did the kind of balancing that Belmontes tells us? In other words, you have to weigh not just the mitigating but everything, the full circumstances. I don't think Judge Ishii has done this, so it's really going to be up to this court to make that evaluation at this point. I think this case is in many ways, particularly when you're looking at the family history evidence, very like James. In the James case, Mr. James was removed from the family home at age four at a time before he could even recall the traumatic circumstances of his upbringing. And this court said that trauma suffered in early childhood can't be discounted on the ground the petitioner has no recollection of the first few years of his life. It is well established that early childhood trauma, even if it's not consciously remembered, may have catastrophic and permanent effects on those who survive it. It has a severe impact on the child's mental development and maturation. Sustained feelings of terror, panic, confusion, and abandonment as a child have long-term consequences for adult behavior. Psychosis, dissociative states, depression, disturbed thinking, and alcohol and drug dependency are directly linked to child victimization. And I think this case is in many ways similar, although I think more extreme, because Mr. Stankiewicz had a stronger tie to his family, a tie that juvenile justice officials were concerned about, so concerned about, in fact, that they believed that they should place him in CYA, notwithstanding the fact that it really wasn't necessarily the most appropriate placement from the point of view of punishment, but for treatment reasons, just to keep him away from this incredibly toxic family and incredibly toxic upbringing. Counsel, before you step down, did you get a chance to respond to Mr. Christofferson's original point that there is evidence that the trial counsel got all of the files? It does appear to us that he did have the files that Mr. Chandra had and that Mr. Chandra passed on those files. Those files did not contain much in the way of history regarding his family members. It was really his own juvenile justice files, rather than focusing on the parents and focusing on the other siblings. How big were these files from Chandra? They were substantial. They were, I think, perhaps 2,000 pages. So we're talking two or three bankers' boxes? I think, yes, about two bankers' boxes. Maybe one bankers' box. The evidence in the records suggests that Mr. Goodwin worked alone, that he didn't hire any investigators, didn't have a paralegal, didn't even have a secretary. So that suggests that if those records were going to be reviewed, they were going to be reviewed by Goodwin personally and not by anybody else. Nobody would be synthesizing anything for him or pulling or tabbing anything for him. Do we have any evidence that Goodwin actually looked at any of this stuff? The only thing we have is the one page. Is the chronology. Is the one page, yes. And could that have been put together from a more limited set of documents in those boxes? It most certainly could have. I believe Mr. Grissom has suggested that there's a presumption to be made. What's your response? Your Honor, I think we really need to look at the explanation that Mr. Goodwin has given regarding his own reasoning and his own actions. Everybody is relying on the 1989 declaration. They are and we are. And really it's what we have to rely on that. And his testimony in the Troy Jones case, which talked about his practice around the time, is really what we can rely on that. And Mr. Shandra's statement about the fact that he was never consulted by Mr. Goodwin, which is a remarkable fact in and of itself as well. Was Shandra or his investigation adequate? Was he trial counsel during the first trial? He was trial counsel during the first trial. Did he put any of this evidence on during the first trial? They actually didn't get to it. He did put some of the evidence on through experts. I think his investigation could have been more comprehensive than it certainly was. And I do think that there were fairly critical mistakes that he made during the course of that trial. Is Shandra still alive? Mr. Shandra is still alive. Was there any discovery with respect to him after remand? He was not deposed. He provided a declaration. I don't think it's absolutely critical. The one statement that we really relied on from him was that Mr. Goodwin never consulted with him. Thank you, Your Honor. Thank you, Counsel. Mr. Christopherson, you have some reserve time. A couple of points that I'd like to make. First, with regards to the 1989 declaration. What we have from that declaration and what we have accepted, the people we've argued that there's no reason to disbelieve that Mr. Stankiewicz was opposed to presenting mitigating evidence and most especially expert testimony and family members. That declaration was prepared on behalf of Petitioner by his current counsel at the time. It doesn't explore, doesn't discuss or explore what Mr. Goodwin had. Certainly at the time when that declaration was presented, the argument from Petitioner's counsel at the time was that Goodwin had not obtained any records. He didn't even obtain trial counsel's files. That was essentially their position and argument throughout. So there was no exploration about what Mr. Goodwin had done with those at a time when he was available to Petitioner to obtain a declaration, and he never explored that fact. Well, I'm not quite following that. You're saying that the Petitioner put in Goodwin's declaration? Yes. Okay, so presumably they talked to Goodwin. Correct. And Goodwin didn't say anything about the files in his declaration? Correct. And their statement that he never got the files was made in what context? Well, they ultimately got another declaration from Goodwin that they have since repudiated that said that he never received any. So he said he didn't. So why do we, with that record, want to assume and presume that he looked all by himself all through those files and then not only didn't mention that in what he did state, but affirmatively stated that he didn't get them? He's not around to do anything more with, so that's the documentary record. And we haven't explored how that documentary record was created and whether it was, A, created after an interview by Petitioner's old counsel and presented to Mr. Goodwin, who then signed it, and they could put whatever they wanted or not wanted to in there. Maybe he told them some information that they didn't want to include at that time. But, again, that record has not been explored in all of what we can find about what Mr. Goodwin may or may not have said back in 1989 when he was interviewed. But you've never asked for an evidentiary hearing in this case, as I understand it. Well, we've always taken... In other words, you went along with the idea of just submitting everything on paper. Well, we've taken the position that it doesn't state a colorable claim for relief. And on remand, when we then learned about the expansion and that, in fact, he had obtained that file, we again took the position that, given that state of the record, that there isn't a colorable claim for relief. And so certainly... And you brought this to Judge Ishii's attention. Yeah, that was our argument at the time. And you didn't make the argument to him that you're now making to us, which is, well, we have to now go and find out what the circumstances of those declarations were. We didn't make that specific argument. Right, and we sent it back so that you could expand the record and conduct evidence into what we had already concluded was a colorable claim. So what you're saying, even though we said it was a colorable claim and spelled it in a lot of detail why, you decided to rest on the record, expand it as it was. And now you're saying, if we don't find that strategy acceptable, then you now want to go back and have more discovery. Is that it? Well, I think, Your Honor, the state... That's what you want? We want an evidentiary hearing so this evidence can be explored properly. We sent it back once for that, and now we hear you acquiesced in not having that. So it's, you know, talk about vice at the apple. We argued what we felt given the change of the allegations in front of the court because it changed significantly from an attorney who did and obtained no records of petitioner's life to an attorney who had those records. Well, did you at the time when that happened, did you make any allegations about fraud on the court or anything? Let me just explain where I'm coming from. You're now up here for a second time after we sent it back for an evidentiary hearing. There's no evidentiary hearing. You told us that you wanted an evidentiary hearing. Now it's being clarified that that's only something you're telling us, that you didn't ask Judge Ishii for it, that you acquiesced in what the procedure he adopted. Counsel was appointed after discovery. You had control of discovery. It was back on your remand, our remand, so you could put a bunch of evidence together. You get these files which had been represented in court to everybody that Goodwin didn't have. I ask you about that now, and you say, well, nobody took the deposition of who put the declaration together. I'm kind of wondering why are we having to deal with this at this late stage? Going back and forth, we last had this in what, 2004? Yes, Your Honor. Okay, it's now seven, eight years later, and what are we going to do? Kick this now back so you can build a better record? Your Honor, if we don't agree with your strategic decision that resting on what is in the record doesn't present a colorable claim? Your Honor, our position is that ultimately Petitioner has the burden of establishing his right. He won on the first round. He got a ruling from us that said, based on what we had in the record, there was a colorable claim of ineffective assistance in performance and on prejudice. But we will remand it so the state can rebut the record. And now what you're resting on, it boils down, is that you now find out that this solo practitioner with no help and who had affirmatively stated, A, that he didn't have the record, and, B, that he decided not to put it on because of Stankiewicz's direction to him. That that is a dramatic change, and that's all you had to have, and now we're back up here. And now you're saying, well, if that doesn't fly, now we want to go back and do more discovery and have an evidentiary hearing. We want to hold Petitioner accountable to his burden of proof, Your Honor, which is establishing the evidence that he claims in many of the allegations, especially those that this Court articulated as being the most shocking, such as sexual abuse and his tearing up the back of a car and being held down by teenage boys. All right, but you had that opportunity, and unless you can persuade us that the findings that Judge Ishii did make are clearly erroneous, isn't the door closed or not? Well, again, Your Honor, Judge Ishii didn't. He did. He listed in a footnote in his finding all of the questionable facts, including the Napa. He said, well, those are questionable. I still find, based on the record, that there is sufficient evidence to sustain what the Ninth Circuit said. I'm talking about footnote one on page two of his order. Warden notes the following questionable allegations, and number two is assertions of sexual abuse at Napa State Hospital, which have no credible support and appear based on the account of a troubled individual with no firsthand knowledge. That's how you described it to him. That's what he acknowledged. And in the next footnote on the next page, he says, Recitation of Stankiewicz's allegations does not infer acceptance of those allegations as true, and reference to facts with questionable support, which he's just listed, extend to all allegations which incorporate those facts. I read his findings, counsel, as saying, okay, I take all the arguments you're presenting to us about the weakness in the record, and he's saying, I still find that he's got a colorable claim, and I grant the writ. You're over time, but I suppose you have an answer. You can make the answer. Yes. Well, Your Honor, Judge Ishii didn't properly explore and re-weigh that evidence, given that once those allegations are taken out, it really becomes greater details about facts that the jury was aware, that Mr. Stankiewicz had an extremely difficult and troubled childhood, and it's further evidence and information regarding his emotional disturbance, which is clearly inferrable from what Joe Walden told the jury. Thank you, counsel. The case just argued will be submitted for decision, and the court will, before adjourning, express its appreciation to counsel on both sides for a very, very helpful argument. Thank you. Thank you.
judges: O'scannlain, Fisher, Bybee